

FILED

JAN 09 2026

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
SAN JOSE OFFICE

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

**Viacheslav Shlapatskyi,**

Plaintiff (*Pro Se*),

Hommevegen 96, Valle, Agder 4747, Norway

Email: hiarttuhill@gmail.com

vs.

YOUTUBE, LLC; GOOGLE LLC;

ALPHABET INC.; and John Does 1–26,

Defendants.

Case No.: **C   26   00279**  **RFL**

*(to be assigned by the Clerk)*

**COMPLAINT FOR COPYRIGHT INFRINGEMENT AND DMCA VIOLATIONS**

**(17 U.S.C. §§ 101–106, 501; 17 U.S.C. § 512)**

# II. TABLE OF CONTENTS

I.      Caption Page ...................................................................................................1
II.     Table of Contents .........................................................................................2
III.    Table of Exhibits ..........................................................................................3
IV.     Introduction .....................................................................................................7
V       Parties ..............................................................................................................10
VI.     Jurisdiction and Venue ................................................................................11
VII.    Factual Background ......................................................................................12
VIII.   Group 1: Thirty-Four Resolved DMCA Instances………….....................20
IX.     Group 2: Thirty Unresolved DMCA  Instances………………….............23
X.      Cause of Action I...........................................................................................37
XI.     Cause of Action II..........................................................................................38
XII.    Cause of Action III .......................................................................................40
XIII.   Cause of Action IV ......................................................................................41
XIV.    Cause of Action V..........................................................................................43
XV.     Declaratory Judgment....................................................................................45
XVI.    Prayer for Relief ........................................................................................ 47
XVII.   Request for bench trial ...............................................................................49

2

### III. TABLE OF EXHIBITS

**(All Exhibits will be filed electronically after the case is opened)**

| Nos. | Exhibit | Title / Description | Page Count |
|------|---------|---------------------|------------|
| 1 | A | Proof of Identity and Residency | 3 |
| 2 | B | ISNI Certification for LADYS Label | 2 |
| 3 | C | Verified Tunecore Distribution Records for "I Scream" | 3 |
| 4 | C2 | The physical vinyl record in the printed sleeve | - |
| 5 | D | Summary Table of Melodic Similarity Metrics… | 2 |
| 6 | E | Content ID Misattribution and Inversion of Authorship | 3 |
| 7 | F | Audio Fragments (30 pieces on the USB flash drive) | - |
| 8 | G-1 | Tunecore Verification Letter… | 2 |
| 9 | G-2 | Audio Forensic Report. File: 1_I_Scream.wav | 4 |
| 10 | G-3 | Diagrams of Chronology… | 5 |
| 11 | G-4 | Documented Postal Suspension | 3 |
| 12 | J | Consolidated Identification Table… | 1 |
| 13 | R-1 | Table of Voluntarily Resolved DMCA Instances… | 1 |
| 14 | R-2 | Table of Resolved  Instances Summaries (28–34) | 1 |
| 15 | R-3 | Table of Unresolved DMCA Instances (35–64) | 2 |
| 16 | M-1 | I Scream Master File Integrity | 3 |
| 17 | 01-A | Instance ID: 1 (Internal Tracking) | 5 |
| 18 | 02-A | Instance ID: 2 (Internal Tracking) | 6 |
| 19 | 03-A | Instance ID: 3 (Internal Tracking) | 5 |
| 20 | 04-A | Instance ID: 4 (Internal Tracking) | 6 |
| 21 | 05-A | Instance ID: 5 (Internal Tracking) | 6 |
| 22 | 06-A | Instance ID: 6 (Internal Tracking) | 7 |

| Nos. | Exhibit | Title / Description | Page Count |
|---|---|---|---|
| 23 | 07-A | Instance ID: 7 (Internal Tracking) | 6 |
| 24 | 08-A | Instance ID: 8 (Internal Tracking) | 5 |
| 25 | 09-A | Instance ID: 9 (Internal Tracking) | 5 |
| 26 | 10-A | Instance ID: 10 (Internal Tracking) | 5 |
| 27 | 11-A | Instance ID: 11 (Internal Tracking) | 6 |
| 28 | 12-A | Instance ID: 12 (Internal Tracking) | 5 |
| 29 | 13-A | Instance ID: 13 (Internal Tracking) | 5 |
| 30 | 14-A | Instance ID: 14 (Internal Tracking) | 6 |
| 31 | 15-A | Instance ID: 15 (Internal Tracking) | 5 |
| 32 | 16-A | Instance ID: 16 (Internal Tracking) | 6 |
| 33 | 17-A | Instance ID: 17 (Internal Tracking) | 4 |
| 34 | 18-A | Instance ID: 18 (Internal Tracking) | 5 |
| 35 | 19-A | Instance ID: 19 (Internal Tracking) | 6 |
| 36 | 20-A | Instance ID: 20 (Internal Tracking) | 5 |
| 37 | 21-A | Instance ID: 21 (Internal Tracking) | 5 |
| 38 | 22-A | Instance ID: 22 (Internal Tracking) | 5 |
| 39 | 23-A | Instance ID: 23 (Internal Tracking) | 5 |
| 40 | 24-A | Instance ID: 24 (Internal Tracking) | 6 |
| 41 | 25-A | Instance ID: 25 (Internal Tracking) | 5 |
| 42 | 26-A | Instance ID: 26 (Internal Tracking) | 5 |
| 43 | 27-A | Instance ID: 27 (Internal Tracking) | 5 |
| 44 | 28-A | Instance ID:28 (Internal Tracking) | 5 |
| 45 | 29-A | Instance ID: 29 (Internal Tracking) | 5 |
| 46 | 30-A | Instance ID: 30 (Internal Tracking) | 5 |

| Nos. | Exhibit | Title / Description | Page Count |
|------|---------|---------------------|------------|
| 47 | 31-A | Instance ID: 31 (Internal Tracking) | 6 |
| 48 | 32-A | Instance ID: 32 (Internal Tracking) | 5 |
| 49 | 33-A | Instance ID: 33 (Internal Tracking) | 5 |
| 50 | 34-A | Instance ID: 34 (Internal Tracking) | 5 |
| 51 | 01-B | Screenshot of Removed Infringing Video | 1 |
| 52 | 02-B | Screenshot of Removed Infringing Video | 1 |
| 53 | 03-B | Screenshot of Removed Infringing Video | 1 |
| 54 | 04-B | Screenshot of Removed Infringing Video | 1 |
| 55 | 05-B | Screenshot of Removed Infringing Video | 1 |
| 56 | 06-B | Screenshot of Removed Infringing Video | 1 |
| 57 | 07-B | Screenshot of Removed Infringing Video | 1 |
| 58 | 08-B | Screenshot of Removed Infringing Video | 1 |
| 59 | 09-B | Screenshot of Removed Infringing Video | 1 |
| 60 | 10-B | Screenshot of Removed Infringing Video | 1 |
| 61 | 11-B | Screenshot of Removed Infringing Video | 1 |
| 62 | 12-B | Screenshot of Removed Infringing Video | 1 |
| 63 | 13-B | Screenshot of Removed Infringing Video | 1 |
| 64 | 14-B | Screenshot of Removed Infringing Video | 1 |
| 65 | 15-B | Screenshot of Removed Infringing Video | 1 |
| 66 | 16-B | Screenshot of Removed Infringing Video | 1 |
| 67 | 17-B | Screenshot of Removed Infringing Video | 1 |
| 68 | 18-B | Screenshot of Removed Infringing Video | 1 |
| 69 | 19-B | Screenshot of Removed Infringing Video | 1 |
| 70 | 20-B | Screenshot of Removed Infringing Video | 1 |

| Nos. | Exhibit | Title / Description | Page Count |
|------|---------|---------------------|------------|
| 71 | 21-B | Screenshot of Removed Infringing Video | 1 |
| 72 | 22-B | Screenshot of Removed Infringing Video | 1 |
| 73 | 23-B | Screenshot of Removed Infringing Video | 1 |
| 74 | 24-B | Screenshot of Removed Infringing Video | 1 |
| 75 | 25-B | Screenshot of Removed Infringing Video | 1 |
| 76 | 26-B | Screenshot of Removed Infringing Video | 1 |
| 77 | 27-B | Screenshot of Removed Infringing Video | 1 |
| 78 | 28-B | Screenshot of Removed Infringing Video | 1 |
| 79 | 29-B | Screenshot of Removed Infringing Video | 1 |
| 80 | 30-B | Screenshot of Removed Infringing Video | 1 |
| 81 | 31-B | Screenshot of Removed Infringing Video | 1 |
| 82 | 32-B | Screenshot of Removed Infringing Video | 1 |
| 83 | 33-B | Screenshot of Removed Infringing Video | 1 |
| 84 | 34-B | Screenshot of Removed Infringing Video | 1 |
| 85 | 35-A | Instance 35… | 9 |
| 86 | 35-B | Description Of Infringing Video And Resulting Harm | 5 |
| 87 | 35-C | Protocol For Identification Of John Doe 1 | 8 |
| 88 | 35-D | Forensic Melodic Similarity Report | 5 |
| 89 | 36-A | Correspondence Record And Legal Analysis | 6 |
| 90 | 37-A | DMCA Notice… | 6 |
| 91 | 37-B | Consolidated Record… | 4 |
| 92 | 38-53(A) | Consolidated Record… | 4 |

## IV. INTRODUCTION

1.      Plaintiff Viacheslav Shlapatskyi brings this action under the Copyright Act, 17 U.S.C. §§101–106 and 501, and under the Digital Millennium Copyright Act (DMCA), 17 U.S.C. §512, to address Defendants' failure to remove infringing material, improper acceptance of defective counter-notifications, wrongful restoration of infringing content, and disregard of statutory takedown procedures.

2.      Plaintiff is the sole author and exclusive copyright owner of the musical composition and sound recording titled "I Scream", which was fixed in a tangible medium of expression on November 26, 2024, and lawfully distributed worldwide on January 9, 2025 through TuneCore (ISRC: TCAJE2557107; UPC: 196056327182). Documentation verifying fixation and publication is submitted in Exhibits G-1 and G-2.

3.      Following the release of Plaintiff's work, numerous YouTube users uploaded infringing YouTube videos, YouTube Shorts, and tracks with artworks that reproduce protectable elements of the musical composition and sound recording "I Scream." These infringing uploads include versions released under titles such as "chess (slowed)," "joyful - chess (chess type beat)", "Rat Dance," "Rat Song," and similar variants.

4.      Importantly, the infringing YouTube videos, YouTube Shorts, and tracks with artworks do not copy the vocal line through direct sampling, but instead re-create the same sung motif and melody by altering only the performance details while preserving the underlying phrase progression and intervallic relationships, re-performing, or imitating it "by ear." Even with such variations, each recording preserves the recognizable identity of the motif originally sung in Plaintiff's work between approximately 1–11 seconds.

5.      These YouTube videos, YouTube Shorts, and tracks with artworks constitute unauthorized derivative works within the meaning of 17 U.S.C. §§ 101 and 106(2), as they preserve recognizable protectable expression notwithstanding variations in speed, timbre, pitch, or instrumentation.

6.      Although the infringing YouTube videos, Shorts, and tracks with artworks contain one or multiple violative audio fragments, the precise number of fragments is legally irrelevant. U.S. courts have consistently recognized that even very short segments

may be protected expression and therefore capable of supporting an infringement claim. Accordingly, even a single brief but recognizable musical fragment within a YouTube video, Short or a track with artwork is legally sufficient to establish copying and substantial similarity under federal law.

7.      Between October and November 2025, Plaintiff submitted sixty-four (64) DMCA notices to YouTube identifying infringing uses of protectable musical material from Plaintiff's work. These infringements appeared in various forms, including slowed, accelerated, pitch-shifted, re-instrumented, and reconstructed performances of the same melodic phrase progression and intervallic relationships ("Protectable Motif").

8.      YouTube processed thirty-four (34) of Plaintiff's DMCA notices by disabling access to the infringing material — twenty-seven (27) videos were voluntarily removed by the uploaders after receiving YouTube's formal DMCA notice, and seven (7) videos were forcibly removed by YouTube following the statutory waiting period, confirming that each of the thirty-four notices fully satisfied all requirements of 17 U.S.C. §512(c)(3).

9.      In addition to these actions, four (4) additional videos—as detailed in Section IX.E—were likewise removed by YouTube following Plaintiff's DMCA notices, bringing the total number of resolved instances to thirty-eight (38) out of sixty-four (64). However, these four videos were later restored without any counter-notification procedure, in direct contravention of the requirements of 17 U.S.C. §512(g). Plaintiff was unable to capture timely screenshots confirming their removal because he reasonably relied on the platform's compliance with the DMCA process. For this reason, these four incidents are classified in this Complaint as part of the second group of unresolved infringing instances, notwithstanding the fact that they were, at one point, properly removed pursuant to Plaintiff's takedown requests.

10.     These thirty-four (34) resolved takedowns affirm Plaintiff's authorship, the originality of the protectable musical material, and the validity of the asserted infringements. Each resolved Instance is summarized in Section VIII with individual references to Exhibits 01-A through 34-A and 01-B through 34-B.

11.     However, YouTube failed to properly process the remaining thirty (30) DMCA notices. In these Instances, YouTube:

(a) declined to remove infringing material despite receiving complete and compliant DMCA notices;

(b) accepted counter-notifications that did not satisfy the statutory requirements of 17 U.S.C. §512(g)(3);

(c) restored infringing material without any counter-notification;

(d) issued unsupported "fraud warnings" despite receiving complete authorship verification;

(e) refused to identify the uploaders, preventing Plaintiff from asserting statutory rights; and

(f) failed to evaluate objective technical evidence of similarity.

12.      Each of these unresolved Instances, although legally required to be treated as individual and independent DMCA disputes, is presented in Section IX in grouped form to aid the Court's understanding of the recurring procedural patterns.

13.      The infringing YouTube videos, Shorts, and singles with artworks contain audio tracks that include one or more fragments exhibiting consistent and substantial similarity to Plaintiff's original musical work. As demonstrated in Exhibit D, every disputed audio fragment aligns closely with Plaintiff's Protectable Motif across multiple independent analytical systems. Across all thirty (30) infringing instances, the Interval-Harmony Coefficient (IHC) shows an exceptionally high uniformity, remaining within 0.97–0.99, while JS tonal-profile similarity ranges from 68% to 86%, with the majority of instances clustering around ≈78–82% similarity. These values reflect reproducible intervallic structures, matching contour trajectories, and preserved tonal centers. Complementing this, Dynamic Time Warping (DTW) melodic-contour analysis yields distances concentrated around 2.5–3.5, which—under normalized MIR scaling—indicates high contour alignment rather than independent melodic creation. Percent Melodic Identity (PMI), derived from global Needleman–Wunsch alignment with transpositional search, as established in paragraph 93, reaches 47.62%, further demonstrating that the recurring melodic structure is not coincidental but reproducible across independently uploaded infringing fragments. Taken together, these metrics form a convergent pattern of similarity that is extremely unlikely to arise by chance between two independently created melodies being compared.

14.    These findings collectively establish that the infringing audio fragments of the YouTube videos—as well as several tracks distributed under the cover of a musical single—contain substantial derivative material directly traceable to Plaintiff's protected musical expression. Their continued availability on the YouTube platform, despite repeated notices and fully documented evidence of copying, constitutes a willful and gross error on the part of YouTube, permitting the ongoing distribution of derivative and infringing content in violation of Plaintiff's exclusive rights under the Copyright Act.

15.    YouTube's improper actions collectively constitute:

(a) failure to act expeditiously under §512(c)(1)(A);

(b) unlawful restoration of removed material contrary to §512(g)(2);

(c) acceptance of counter-notifications lacking statutory elements under §512(g)(3);

(d) obstruction of enforcement through refusal to identify infringers;

(e) loss of DMCA safe-harbor protection under §512(c).

16.    Plaintiff seeks statutory damages, actual damages, injunctive relief, an order compelling production of Content ID records and DMCA processing logs, and identification of John Does defendants to permit proper service and enforcement of rights under the Copyright Act.

## V. PARTIES

### Plaintiff

17.    Plaintiff Viacheslav Shlapatskyi is an individual residing in Norway and is the sole author and exclusive copyright owner of the musical composition and sound recording "I Scream." Plaintiff brings this action *pro se*. Documentation confirming Plaintiff's residency is attached as Exhibit A.

### Defendants

18.    Defendant YouTube, LLC is a Delaware limited liability company with its principal place of business at 901 Cherry Avenue, San Bruno, California 94066.

Defendant Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.

Alphabet Inc. is a Delaware corporation and the parent company of Google LLC. To the extent Alphabet Inc. exercises control over YouTube's policies or systems relevant

to the conduct alleged herein, it is named as a defendant.

**John Does 1–26**

19.     John Does 2–9 are individuals whose identities are either unknown or only partially ascertainable to Plaintiff based on the incomplete and inconsistent information provided in their counter-notifications, as summarized in the consolidated identification table (see Exhibit J), and who:

(a) uploaded infringing recordings containing derivative reproductions of Plaintiff's copyrighted work;

(b) submitted counter-notifications under 17 U.S.C. §512(g)(3);

(c) asserted ownership claims related to derivative works; or

(d) otherwise participated in the distribution, publication, or monetization of the infringing recordings at issue.

20.     John Does 1 and 10–26 are uploaders of the infringing videos whose identities are unknown to Plaintiff because YouTube blocked access to their account information and prevented any direct contact, thereby depriving Plaintiff of the ability to identify the infringers through the normal DMCA dispute-resolution process.

21.     Plaintiff will amend this Complaint upon identification of these individuals through discovery.

## VI. JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction under 28 U.S.C. §1331, because this action arises under federal law, and under 28 U.S.C. §1338(a), because this action involves claims for copyright infringement and DMCA violations.

23.     This Court has personal jurisdiction over Defendants YouTube, LLC and Google LLC because each is headquartered in the Northern District of California and conducts substantial business operations within this District. Defendant Alphabet Inc. is also subject to personal jurisdiction because it is the parent company of Google LLC and exercises oversight over policies and systems relevant to the challenged conduct.

24.     Venue is proper in this District under 28 U.S.C. §1391(b) and §1400(a) because:

(a) a substantial part of the events giving rise to the claims occurred in this District;

(b) Defendants YouTube, LLC and Google LLC maintain principal places of business in this District; and

(c) YouTube's Terms of Service constitute a contractual agreement designating Santa Clara County, California, as the forum for disputes arising from the platform's operation.

25.    The Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§2201–2202 and 17 U.S.C. §§502–505.

## VII. FACTUAL BACKGROUND

### VII.A. Plaintiff's Work and Copyright Ownership

26.    Plaintiff is the official representative of the LADYS music label, which is registered and identified through the International Standard Name Identifier (ISNI) system. A copy of the ISNI certification associated with the LADYS label is attached as Exhibit B.

27.    As stated in paragraph 2, Plaintiff is the sole author of the musical composition and sound recording titled "I Scream". The work was fixed in a tangible medium of expression on November 26, 2024, in the form of a PCM WAV audio file "I Scream.wav" (General Exhibit G-2).

28.    To establish the authenticity, integrity, and priority of fixation of this master file, Plaintiff has prepared a forensic integrity record (see Exhibit M-1), which includes SHA-256 and MD5 cryptographic fingerprints of the original PCM WAV recording. An identical copy of the master file is provided on a sealed USB flash drive, inside a dedicated directory titled "Exhibit M — I Scream Master File", submitted as physical evidence. Because cryptographic hash functions provide an industry-standard, tamper-proof identifier of the digital content, the Court may request that TuneCore, the distributor of "I Scream," produce its internal checksum logs and upload-timestamp records for the master file pursuant to Rule 45. A matching checksum would conclusively verify that the WAV file submitted by Plaintiff is the unchanged master recording fixed on November 26, 2024, thereby independently corroborating Plaintiff's fixation date and authorship.

29.    Under 17 U.S.C. §102(a), copyright protection attaches upon fixation, requiring no further act. Under Article 5(2) of the Berne Convention, to which the United

States is a signatory, copyright protection is not subject to registration or other formalities. Accordingly, Plaintiff's exclusive rights arose automatically on November 26, 2024.

30.    Plaintiff distributed "I Scream" worldwide through the digital distributor TuneCore on January 9, 2025, as part of the eponymous musical album bearing the same title. TuneCore assigned ISRC TCAJE2557107 and UPC 196056327182 to this release. Verified TuneCore distribution records—including the official release ID, ISRC/UPC metadata, publication URL, and corresponding visual documentation—are provided in Exhibit C (C-1). In addition, the complete sound recording as published—together with its album cover artwork and corresponding metadata—is submitted as a physical evidentiary item in the form of the original vinyl record with printed sleeve—Exhibit C (C-2).

31.    The protectable elements of Plaintiff's work include an original melodic phrase progression and a specific sequence of intervallic relationships that together form a distinctive musical motif ("Protectable Motif"). This motif is performed vocally approximately between 1–11 seconds of the sound recording and is repeated instrumentally between 12–21 seconds.

32.    The Protectable Motif is comprised of the following 18-note melodic sequence: C4 – D#4 – F4 – G4 – G4 – F#4 – F4 – G4 – F#4 – D4 – D#4 – D4 – C4 – B3 – C4 – D4 – G3 – C4.

33.    The Protectable Motif constitutes copyrightable musical expression under federal standards because it:

(a) exhibits a definable melodic contour;

(b) demonstrates non-trivial intervallic structure;

(c) has rhythmic and temporal consistency; and

(d) is recognizable to an ordinary observer even when transposed, slowed, accelerated, or re-instrumented.

34.    The infringing recordings that gave rise to Plaintiff's DMCA notices reproduce this Protectable Motif through slowed, sped-up, pitch-shifted, or re-created performances, each of which retains a substantial and significant portion of the original phrase progression and intervallic structure. Technical computational results confirming

substantial similarity in each disputed instance are provided in Exhibit D. All audio fragments identified in the Exhibit D summary table were compared against the same reference portion of the Plaintiff's original sound recording. This reference segment begins at 00:01.5 and spans 9.67 seconds, and serves as the fixed Protectable Motif used uniformly across all similarity measurements.

35.     The infringing audio fragments embedded within the YouTube videos, Shorts, and tracks with artworks constitute derivative works under 17 U.S.C. §101 and §106(2) because they incorporate protectable expressive elements from Plaintiff's original sound recording.

36.     Muting the infringing audio fragments while keeping the YouTube video publicly accessible is not a legally recognized remedy for copyright infringement. Under the DMCA framework and the exclusive rights granted by 17 U.S.C. §106, the unauthorized use of protectable audio expression within a video constitutes infringement regardless of whether the platform later suppresses or silences portions of the audio track. Accordingly, complete removal of the infringing video—not muting isolated segments—is the only legally sufficient method of resolving the violation under 17 U.S.C. §512.

### VII.A.1. Automatic Copyright Protection for Sound Recordings Fixed in a Treaty Party

37.     Artistically, the Work musically re-imagines the emotional universe of Edvard Munch's "The Scream" (1893), interpreting its psychological depth through a vocal motif inspired by the emotional states of Munch's muses—Milly Thaulow, Mathilde "Tulla" Larsen, and Eva Mudocci. By integrating elements of Norway's cultural and artistic heritage, the Plaintiff fixed an original sound recording ("phonogram") that qualifies as a protectable "work of authorship" under U.S. and international copyright law.

38.     Under 17 U.S.C. §102(a), copyright protection attaches automatically when an original sound recording is "fixed in a tangible medium of expression." No publication, registration, deposit, or distribution is required for protection to arise.

39.     Further, pursuant to 17 U.S.C. §104(b)(3):

"The works specified by sections 102 and 103, when published, are subject to

protection under this title if—

(3) the work is a sound recording that was first fixed in a treaty party;"

40.    Accordingly, Plaintiff's work—first fixed on November 26, 2024 in Norway—is fully protected in the United States without any additional formality. This protection applies regardless of the date of public release or the subsequent appearance of derivative, imitative, or reconstructed versions uploaded by third parties.

41.    YouTube's failure to recognize this automatic protection contradicts the legal framework established by the U.S. federal law. Instead, YouTube relies on its automated Content ID system in a way that elevates unoriginal derivative "type beats," "slowed," "sped-up," or "super-slowed" manipulations—material that lacks independent originality—over legitimately authored and fixed sound recordings.

42.    This practice directly conflicts with widely accepted industry standards, such as the guidelines published by digital distributors (including the TuneCore / Facebook / Instagram Music policy), which states:

"You cannot submit tracks for monetization that contain instrumental content such as samples or beats (even if you have a distribution license)."

43.    By disregarding these established protections and industry norms, YouTube has created a marketplace in which derivative fragments and manipulated beat-type recordings are treated as legitimately authored works, while true authorship—protected under international law—is ignored. YouTube thereby incentivizes infringement, undermines internationally recognized authors' rights, and destabilizes the legal hierarchy that places original works above unauthorized derivative reproductions.

**VII.B. Technical analytical framework**

44.    To support the infringement claims in this action, Plaintiff developed two independent analytical systems rooted in established principles of Music Information Retrieval (MIR), computational musicology, and sequence-alignment theory. These methods operate on symbolic and audio-derived representations of melodies and provide objective, reproducible similarity measurements appropriate for judicial review under FRE 702 and FRCP 26. The scientific basis, methodological details, and all computational procedures—including the accompanying Python code—can be provided to the Court upon request in full compliance with FRE 702 and FRCP 26.

### VII.B.1 Primary Percent Melodic Identity (PMI) Analysis

45.    The Percent Melodic Identity (PMI) method is used as the primary analytical tool for comparing Plaintiff's Protectable Motif with the derivative melodic fragments. PMI aligns two melodic sequences, applies optimal transposition, identifies matching pitch elements, and produces a single numerical measure of melodic identity based on the percentage of shared pitch events. The full technical model (PMI, MIR, DTW, algorithmic framework, code) is preserved and available for submission at the Court's request or at a later procedural stage.

46.    A single foundational PMI analysis was conducted between Plaintiff's Protectable Motif (the 1–11 second introductory phrase of "I Scream") and the principal derivative fragment appearing at approximately the 19-second mark of the "chess (slowed)" recording. Because all sixty-four infringing uploads reproduce this same motif—whether slowed, sped up, pitch-shifted, or re-performed—this one comparison is sufficient for all instances.

47.    U.S. case law confirms that repeated expert analyses are unnecessary when the copied melodic phrase is immediately recognizable to an ordinary listener. See Three Boys Music Corp. v. Bolton, 212 F.3d 477 (9th Cir. 2000); Swirsky v. Carey, 376 F.3d 841 (9th Cir. 2004); Arnstein v. Porter, 154 F.2d 464 (2d Cir. 1946). Once the identity of the motif is established, every subsequent reproduction constitutes substantial similarity under the ordinary-listener standard.

48.    Peer-reviewed infringement research by Yuchen Yuan and others (2023) evaluating forty litigated cases identifies a PMI threshold of approximately 45% as strongly associated with substantial similarity findings. PMI values above this range therefore indicate significant melodic correspondence consistent with non-independent creation.

### VII.B.2 Secondary Forensic MIR Analysis

49.    For each of the thirty unresolved infringing recordings, Plaintiff applied the same multi-factor forensic audio analysis based on established principles of Music Information Retrieval (MIR). To avoid unnecessary duplication and to prevent overburdening the Court with thirty repetitive technical annexes demonstrating the same result, Plaintiff does not attach each protocol individually. These analyses were

repeatedly submitted to YouTube during the DMCA process, and at no time did YouTube indicate that they had been reviewed, evaluated, or rejected on technical or legal grounds.

50.    The full methodology—including contour-based comparison, interval-structure evaluation, pitch-class analysis, and transpositional compatibility—was applied uniformly across all unresolved instances, each of which contains the same Protectable Motif identified in Paragraph 32. The methodology provides a consistent, scientifically validated basis for determining melodic similarity even when the derivative recordings are transposed, slowed, accelerated, time-stretched, or otherwise modified.

**VII.C. Chronology and Authorship Inversion ("Chess Paradox")**

51.    After Plaintiff fixed the original musical work "I Scream" on November 26, 2024, a third party presented here as John Doe 1 uploaded to YouTube a track titled "joyful – chess (chess type beat)" on November 30, 2024, which is expressed through a 24-note melodic sequence consisting of the following pitches: F#4 – F#4 – F4 – C#4 – E4 – D4 – C#4 – C#4 – B3 – A3 – B3 – A3 – F#3 – B3 – A3 – B3 – E4 – D4 – C#4 – C#4 – B3 – A3 – B3 – C#4.

52.    For purposes of comparative timing, the track titled "joyful – chess (chess type beat)," which was uploaded to YouTube by John Doe 1 without any accompanying cover art, without evidence of prior publication, and without any indication of an identifiable author who could assert independent authorship or could have published a similar work at an earlier date, is treated as having its fixation date on November 30, 2024.

53.    Although the upload predates Plaintiff's public release, it postdates Plaintiff's fixation — the only legally relevant moment at which copyright arises under 17 U.S.C. §102(a). The question of "independent creation" does not depend on whether the later uploader knew of Plaintiff's fixation or had access to Plaintiff's non-public copy; it is determined by whether the later work reproduces protectable expression that already existed in Plaintiff's earlier fixed composition. If substantial similarity appears between two works and one was fixed earlier in time, the later work cannot qualify as independently created as a matter of law, regardless of whether the infringer was aware of the earlier fixation or whether the work had been publicly released. Independent creation requires originality, not innocence; and originality cannot be established where the later

work's melodic material duplicates expression fixed earlier by Plaintiff.

54.    Under U.S. copyright law, the first fixed and first released version of a musical work functions as the parent source-work. Any later track that incorporates protectable elements of that parent work is legally classified as a derivative work under 17 U.S.C. §101 and §106(2).

55.    Accordingly, no work released at a later date can be treated as the parent or source-work of an earlier fixed composition; chronological priority is determined exclusively by the earliest demonstrable fixation under U.S. copyright law.

56.    Subsequent uploads by John Doe 1 included variations titled "chess (slowed)," "chess (super slowed)," "chess (speed-up)," and similar derivatives. Each version exhibits intervallic and contour-based similarities to the Protectable Motif from "I Scream."

57.    On January 9, 2025, as stated in Paragraph 30, Plaintiff distributed "I Scream" worldwide through the digital distributor TuneCore as part of the eponymous musical album bearing the same title. TuneCore assigned ISRC TCAJE2557107 and UPC 196056327182 to this release, with the official release date set for January 9, 2025.

58.    On January 14, 2025—the release date of the track commonly associated with the opposing work "chess (slowed),"—a slowed version of "joyful – chess (chess type beat)" was released as part of YouTube's Content ID program. The track was published on YouTube on February 1, 2025.

59.    Accordingly, Plaintiff's protected musical work "I Scream" predates the Content ID-registered track in every legally relevant respect: it has an earlier fixation date (November 26, 2024) and an earlier official release date (January 9, 2025) than the version of "chess (slowed)" that was later ingested into YouTube's Content ID system and publicly published only on February 1, 2025. Under U.S. copyright law, priority is determined by the earliest fixation. Therefore, the YouTube-registered "chess (slowed)" cannot qualify as the parent, source, or original independently created work relative to Plaintiff's earlier-fixed and earlier-released composition. General Exhibit G-3 contains diagrams and timelines illustrating the inversion of authorship and its consequences for Plaintiff's enforcement rights.

60.    Despite being the later publication, YouTube's Content ID system

18

mistakenly treated "chess (slowed)" as the "original" work and assigned its fingerprint as if it were the parent reference file. As a result, this later-issued derivative fingerprint was incorrectly applied to an earlier track published on November 30, 2024, overriding the true chronological order of fixation. This inversion violates the fundamental principle that an earlier fixed work functions as the parent source-file and contradicts core copyright rules governing originality, authorship priority, and derivative status (see Exhibit E).

61.     This misclassification within Content ID, resulting in an inverted authorship hierarchy—a phenomenon Plaintiff refers to as the "Chess Paradox"—prevented Plaintiff's DMCA notices from being processed correctly and resulted in the rehabilitation of infringing material through reliance on automated metadata rather than statutory copyright principles.

62.     This paradox—in which Content ID assigns authorship priority to a later-created derivative or infringing work and imposes that attribution retroactively onto earlier original works—is fundamentally incompatible with the principles of U.S. copyright law. Such algorithmic overwriting of authorship poses a systemic threat to thousands of musicians whose copyrighted works are distributed through third-party providers and later uploaded to YouTube.

63.     By allowing automated metadata to override statutory rights of fixation, originality, and authorship, YouTube's Content ID system creates a mechanism by which an infringing track can algorithmically "claim" ownership over prior original works, contradicting the Copyright Act and undermining creators' ability to enforce their rights.

64.     While this misclassification originates as a technical failure within YouTube's Content ID system, any subsequent reliance on that error to deny, reverse, or otherwise undermine DMCA protections in disputes involving 'chess (slowed),' 'Chess (Type Beat),' or 'Chess (Type Beat) (Slowed)' renders YouTube's determinations inherently unreliable and legally deficient, as such reliance contradicts the statutory requirements and procedural safeguards mandated by 17 U.S.C. § 512.

**VII.D. Postal Suspension Affecting DMCA Litigation Window**

65.     Between August 29, 2025, and January 1, 2026, Norway suspended all postal shipments to the United States. Documentation appears in General Exhibit G-4.

66.     During this period, Plaintiff was legally unable to mail required statements

or federal civil complaints in response to counter-notifications. Plaintiff informed YouTube of this impediment but infringing material was nevertheless restored on the ground that Plaintiff "failed to file suit within 10–14 business days."

67.     This created an impossibility of performance not contemplated by §512(g), and restoration under such circumstances constitutes wrongful restoration under federal law.

## VIII. GROUP 1: THIRTY-FOUR RESOLVED DMCA INSTANCES

### VIII.A. General Statement

68.     This Section outlines the thirty-four (34) DMCA notices for which YouTube properly executed its takedown duties under 17 U.S.C. §512(c)(1)(A), thereby confirming Plaintiff's full compliance with all statutory elements.

### VIII.B. Resolved Instance Summaries (01–27). Voluntarily removed content.

69.     Exhibits 01–A through 27–A collectively demonstrate a consistent and documented pattern in YouTube's handling of Plaintiff's DMCA notices. In all twenty-seven (27) Instances, YouTube formally acknowledged receipt of valid takedown requests under 17 U.S.C. §512(c)(3) and activated the statutory seven-day delayed-takedown procedure under §512(g)(2), thereby confirming Plaintiff's compliance with all statutory elements and YouTube's actual knowledge of infringement. Exhibits 01–B through 27–B demonstrate that the infringing videos were deleted by the uploaders after receiving Plaintiff's DMCA notices.

70.     In each of these twenty-seven Instances (General Exhibit R-1—Table of Voluntarily Resolved DMCA Instances), the infringing uploader deleted the video only after receiving YouTube's DMCA notice, resulting in the destruction of all monetization data, analytics, impression logs, audience-retention metrics, RPM/CPM histories, and other electronically stored information ("ESI") that YouTube was required to preserve once a copyright dispute had arisen. Such loss of evidence constitutes spoliation under FRCP 37(e) and the federal standards articulated in Zubulake v. UBS Warburg, Silvestri v. GM, and Sekisui Am. Corp. v. Hart.

71.     Despite confirming the validity of Plaintiff's DMCA notices, YouTube repeatedly refused to disclose monetization data and internal analytics necessary to calculate actual damages and infringer's profits under 17 U.S.C. §504(b). YouTube

provided no timestamps of deletion, no revenue figures, and no preserved server-side records, effectively preventing Plaintiff from assessing financial harm caused by millions of unauthorized views.

72.    Beginning around the later Instances, YouTube issued a series of procedurally irregular and demonstrably inaccurate notices stating that "the content has been reinstated," even though the videos had already been permanently deleted by the uploaders and no counter-notifications were submitted. Deleted Shorts cannot be reinstated under YouTube's own technical architecture, making these restoration notices factually impossible and legally misleading.

73.    These false reinstatement notices, combined with YouTube's failure to preserve evidence and refusal to provide required monetization data, demonstrate a pattern of bad-faith handling of DMCA claims. This conduct constitutes misrepresentation, obstruction, and noncompliance with §512(c) and §512(g), independently supporting the loss of DMCA safe-harbor protections under §512(i).

74.    Across all 27 Instances, the Exhibits collectively show:

(a) confirmation of infringement by YouTube;

(b) destruction of evidence after DMCA notice;

(c) failure to disclose records required under §504(b);

(d) issuance of false or contradictory procedural notices; and

(e) systemic noncompliance with takedown and restoration procedures.

75.    This consistent pattern forms a unified evidentiary basis demonstrating deliberate or reckless disregard of Plaintiff's copyright and DMCA rights.

**VIII.C. Resolved Instances Summaries (28–34). Forcibly removed content.**

76.    As documented in Exhibits 28-A–34-A, YouTube acknowledged receipt of Plaintiff's valid DMCA notices, activated the statutory seven-day delayed takedown procedure under 17 U.S.C. §512(g)(2), and subsequently executed platform-initiated forced removal after no counter-notifications were filed. These records collectively confirm full statutory compliance by Plaintiff under §512(c)(3) and YouTube's recognition that each recording constituted infringing material subject to removal.

77.    These forcibly executed takedowns are summarized collectively in General Exhibit R-2 (Table of Forcibly Resolved DMCA Instances). The corresponding

Exhibits 28-B–34-B contain direct evidentiary captures of YouTube's removal banners showing that the videos identified in Exhibits 28-A–34-A were in fact deleted from public access ("This video is no longer available due to a copyright claim…"). These "-B" exhibits document the completed state of removal for each Instance number.

78.     In addition, Exhibits 33-A–34-A further demonstrate that, despite proper removal (confirmed in 33-B–34-B), YouTube later unlawfully restored the infringing material without any counter-notification, in direct violation of 17 U.S.C. §512(g).

**VIII.D. General Conclusion**

79.     The thirty-four (34) DMCA takedowns (see Exhibits 1-B–34-B) previously executed by YouTube constitute direct admissions that Plaintiff's Protectable Motif is a copyrighted, protectable musical expression and that the reproduction of that motif in user-uploaded videos constitutes copyright infringement. Once a service provider has recognized identical infringements across multiple instances involving the same melodic material, it is legally inconsistent and arbitrary to treat the remaining thirty (30) instances as "disputed," because the underlying copyrighted element, the method of copying, and the nature of the derivative manipulation (slowed, sped-up, pitch-shifted, or reconstructed) are materially identical across all sixty-four (64) instances. Under §512(c) and §512(g), a provider must apply takedown standards consistently; inconsistent enforcement constitutes arbitrary and capricious DMCA processing and results in loss of safe-harbor eligibility for the entire category of infringing content.

80.     Across all thirty-four documented DMCA cases (see Exhibits 1-A–34-A), YouTube repeatedly confirmed the validity of Plaintiff's takedown notices, acknowledged infringement, and initiated the statutory seven-day delayed removal process, yet nevertheless allowed systemic violations to occur at every subsequent stage. In numerous cases, infringing videos were voluntarily deleted by uploaders immediately after receiving the DMCA notice, causing the destruction of monetization logs, ad-impression data, watch-time analytics, regional revenue information, and other server-side evidence that YouTube was legally obligated to preserve once it acquired actual knowledge of infringement. In all remaining cases, YouTube itself executed forced removals after the seven-day period but again failed to preserve or produce the required monetization and analytic data, constituting spoliation of evidence under FRCP 37(e) and

obstructing Plaintiff's right to obtain infringer's profits under 17 U.S.C. §504(b). In the most serious instances, YouTube unlawfully restored previously removed infringing content without any counter-notification, without forwarding a counter-notice to the Plaintiff, and without observing the mandatory 10–14 business-day waiting period, thereby violating §512(g), forfeiting safe-harbor protection under §512(c), and directly enabling further infringing views. Despite hundreds of millions of unauthorized views documented across all 34 exhibits, YouTube repeatedly refused to provide monetization data, refused to assist with damage calculations, and issued non-responsive or misleading communications. Although the videos were ultimately removed, Plaintiff identifies a clear pattern of statutory violations, evidence destruction, unlawful restoration, and obstruction of rights—and therefore respectfully seeks full compensation for lost profits, disgorgement of all revenues derived from the infringements, statutory damages for willful violations, and any additional relief the Court deems appropriate.

## IX. Group 2: Thirty Unresolved DMCA Instances

### IX.A. General Statement

81.     This Section details the thirty (30) DMCA notices that were not processed correctly by YouTube under the statutory requirements of 17 U.S.C. §512(c) and §512(g).

82.     These Instances include:

(a) failures to remove infringing material despite valid DMCA notices;

(b) acceptance of counter-notifications missing statutory elements;

(c) restoration of material without counter-notifications;

(d) improper reliance on Content ID metadata instead of copyright law; and

(e) refusals to identify uploaders, preventing Plaintiff's exercise of rights.

83.     Exhibit R-3 provides a consolidated summary of the thirty (30) unresolved DMCA instances referenced in this Section, including for each incident the infringing YouTube channel, view count, URL, corresponding DMCA complaint code, associated John Doe identifier, and the linked audio-fragment reference ("InSound_XX.wav"). Exhibit R-3 therefore serves as a structured, high-level evidentiary index for the thirty unresolved incidents, enabling efficient judicial review while ensuring that all underlying records remain available for production without delay.

84.     For the Court's convenience, all audio files corresponding to the thirty

(30) infringing YouTube videos identified in Exhibit R-3 have been collected, labeled, and organized into a dedicated directory titled "Exhibit F – Audio Fragments." These files are provided to the Court on a USB flash drive as a physical evidentiary item.

85.    Each audio file is named according to the reference identifier used in Exhibit R-3 (e.g., "InSound_02.wav," "InSound_17.wav"), ensuring a direct one-to-one correspondence between the table entries and the individual audio exhibits. This organization is intended to facilitate efficient judicial review, allowing the Court to instantly access each infringing audio fragment without cross-referencing external sources or relying on live YouTube availability.

86.    Each audio file was created by playing back the infringing YouTube video in real time and capturing the accompanying audio using independent sound-recording equipment. This evidentiary process necessarily increased the view count of each infringing video, as YouTube registers every playback as a new view.

**IX.B. Instance 35—REFUSAL TO REMOVE INFRINGING MATERIAL BASED ON A NON-STATUTORY "LICENSE" JUSTIFICATION AND FAILURE TO RECOGNIZE PLAINTIFF'S EARLIER FIXATION AND EXCLUSIVE RIGHTS**

87.    Plaintiff submitted a complete and fully compliant DMCA notice identifying infringing content reproducing the Protectable Motif, satisfying all statutory elements under 17 U.S.C. §512(c)(3)(A)(i)–(vi). YouTube acknowledged receipt of the notice on 27 October 2025. See Exhibit 35-A.

88.    YouTube declined to remove the infringing material on the impermissible ground that the content "was uploaded under a license," a justification not recognized under §512(c) or §512(g). YouTube failed to identify the alleged licensor, provide any chain-of-title documentation, or verify whether the purported "license" covered Plaintiff's earlier-fixed melodic expression. See Exhibit 35-A.

89.    No counter-notification was filed by the uploader as required under §512(g)(3). YouTube nevertheless left the infringing material online and terminated the takedown process without invoking any statutory basis for refusal.

90.    YouTube declined to remove the material, asserting "no copyright issue identified," despite receiving full authorship verification and ISRC/UPC evidence. The

infringing video remained publicly accessible. See Exhibit 35-B.

91.    Although no counter-notification was filed by the uploader under §512(g)(3), the available evidence indicates that this same individual—designated herein as John Doe 1—likely initiated a separate and fraudulent copyright complaint against Plaintiff's work through Spotify (forwarded to TuneCore), resulting in the temporary blocking of Plaintiff's legitimate release. Identification of John Doe 1 is therefore essential to enforce Plaintiff's rights and to establish the connection between the infringing YouTube upload and the external false rights-claim affecting Plaintiff's distribution channels. See Exhibit 35-C.

92.    Furthermore, evidence associated with John Doe 1 indicates that TuneCore failed to comply with the statutory obligations of 17 U.S.C. §512(g). After receiving the fraudulent copyright complaint submitted through Spotify and forwarded by TuneCore, the service provider did not restore Plaintiff's work—or the entire album in which it appears—after the expiration of the statutory 10-business-day period, despite Plaintiff's full compliance with all DMCA requirements. Instead, TuneCore effectively forced Plaintiff into an unlawful position, requiring him either (1) to contact John Doe 1 directly and "resolve" the complaint privately, or (2) to petition John Doe 1 to retract the fraudulent complaint. Both actions are prohibited under the DMCA, which explicitly bars service providers from shifting enforcement obligations onto the copyright holder or conditioning restoration of lawful content on private negotiations with an unidentified infringer. This failure by TuneCore—combined with the inability to determine whether John Doe 1 personally submitted the fraudulent complaint or whether the complaint originated from a coordinated group acting with the intent to confuse multiple platforms and keep the infringing "beat family" online—creates an urgent need to identify John Doe 1. Confirming the origin of the fraudulent complaint is essential to establish whether the false rights-claim was part of a broader scheme designed to obstruct enforcement, manipulate automated rights-management systems, and disadvantage the Plaintiff across multiple distribution channels.

93.    After comparing the melodic sequence constituting the Protectable Motif defined in Paragraph 32 with the melodic material contained in the "chess type beat" family of uploads—specifically the fragment beginning at approximately 19 seconds of

the recording "chess (slowed)" defined in Paragraph 51—and applying the Primary Percent Melodic Identity (PMI) method described in Section VII.B.1, the analysis produced the following quantitative results: the optimal transposition between the sequences was 1 semitone; the number of identical aligned notes (ID) was 10; the average melodic length was 21.00; and the computed **PMI score is 47.62%.** Under the interpretive scale established in peer-reviewed research (PMI ≈ 0–20%: low identity; 20–40%: moderate similarity; 40–60%: high similarity; >60%: very strong overlap), a PMI of 47.62% places the pair squarely within the zone classified as "high similarity," a range frequently associated with suspicious or infringing melodic correspondence in empirical studies. This PMI value confirms that the "chess type beat" fragment reproduces a substantial and protectable portion of the melodic identity of Plaintiff's Motif, notwithstanding alterations in speed, timbre, production, or performance. Accordingly, the PMI analysis supports a finding of substantial similarity under U.S. copyright standards and corroborates the derivative nature of the "chess type beat" uploads.

94.    Technical analysis between Plaintiff's introductory Protectable Motif (approximately 1–11 seconds of "I Scream") and the derivative melodic fragment beginning at approximately 19 seconds of the "chess (slowed)" recording—conducted pursuant to the forensic MIR methodology described in T-Series Exhibits T3 and T4—confirms substantial similarity between the audio files. As documented in Exhibit 35-D the optimal transposition between the sequences is +3 semitones; the z-normalized Dynamic Time Warping (DTW) distance is 0.2480943862; the absolute-semitone DTW distance is 2.8241828386; the interval-histogram cosine similarity is 0.9981159458; and the Jensen–Shannon pitch-class similarity is 79.96077499%. These jointly indicate a shared melodic skeleton, extremely close intervallic structure, and near-identical pitch-class distribution once transposition is accounted for. Under accepted MIR and copyright-forensic standards, this constellation of metrics is incompatible with independent creation and demonstrates unauthorized reproduction of protectable musical expression.

95.    By relying on a non-statutory "license" justification, refusing to remove infringing content without a counter-notification, failing to recognize the Plaintiff's

earlier fixation under §104(b)(3), and obstructing enforcement by withholding the identity of the asserted rights claimant, YouTube violated 17 U.S.C. §512(c)(1)(A), §512(c)(3), §512(g)(2), and §512(i).

96.    Further, even *assuming arguendo* that the uploader distributed the infringing audio under a so-called "license," such a license cannot legitimize the reproduction of Plaintiff's earlier-fixed melodic expression. "Type beat" recordings, including the chess-family uploads at issue, do not qualify as independently copyrightable works when they merely re-perform, imitate, or rearrange pre-existing melodic material. Under 17 U.S.C. §§101, 102(a), and 106, only original expression fixed by the author enjoys protection; derivative imitative recordings—especially those marketed as generic "type beats"—lack the originality necessary to override or compete with Plaintiff's exclusive rights. No license granted to a third party can authorize the use of Plaintiff's Protectable Motif, because copyright ownership arises automatically upon fixation and cannot be displaced by later "licensed" derivative content. Accordingly, YouTube's reliance on an unspecified 'license' theory is legally invalid under §512(c) and §512(g), and cannot serve as a lawful basis to refuse removal of infringing material.

## IX.C.    Instance    36-37—SYSTEMIC    FRAUDULENT COUNTER-NOTIFICATION AND FALSE FRAUD-ACCUSATION ABUSE BY YOUTUBE AND THE UPLOADERS

97.    The Plaintiff submitted a fully compliant DMCA takedown notice containing all elements required under 17 U.S.C. §512(c)(3), as documented in Exhibit 36-A. YouTube acknowledged the notice, accepted it as valid, initiated the statutory takedown period, and confirmed that the infringing video would be removed unless the uploader took action.

98.    In direct response to this valid notice, YouTube transmitted a counter-notification by John Doe 2 under ID M7RLYO3AAYYLUTWALOWNFQEBOI that contained demonstrably false statements made under penalty of perjury, including fabricated assertions that Plaintiff's copyrighted work had been removed from distribution and that Plaintiff "no longer had a basis" to assert his rights. Despite the facial falsity and legal invalidity of this counter-notification, YouTube accepted it, processed it, and ultimately reinstated the infringing content outside of the DMCA

process, thereby enabling and amplifying the counter-notifier's fraudulent conduct. These actions constitute fraudulent counter-notification abuse and a material violation of the statutory procedures of §512(g).

99.    The same pattern of procedural misconduct and fraudulent counter-notification abuse occurred under DMCA Notice CQ37DSG5JZ2I7UTRAFBFXX4UO4. Despite the Plaintiff submitting a fully compliant takedown request containing every statutory element required by 17 U.S.C. §512(c)(3), YouTube improperly reinstated the infringing video prior to the statutory 10–14 day waiting period and falsely labeled the complaint as "incomplete." YouTube then accepted and processed a counter-notification submitted by John Doe 3 under ID DJV6DWZ3PJ6MLNTNSD47MBDEGU, even though the counter-notification contained multiple facial defects and sworn falsehoods, including the knowingly false assertion that Plaintiff's copyrighted work had been removed from all DSPs and that Plaintiff "no longer has a basis" to issue takedowns. These misrepresentations were made under penalty of perjury and violate 17 U.S.C. §512(f). YouTube nevertheless transmitted this defective counter-notification to the Plaintiff, demanded evidence of federal litigation, and continued to repeat the unfounded claim that Plaintiff's notices were "incomplete," thereby enabling the fraudulent filing, failing to follow the statutory requirements of §512(g), and contributing to the ongoing infringement. All correspondence, reinstatement notices, counter-notification materials, and Plaintiff's responses are consolidated in Exhibit 37-A.

100.    In addition to the counter-notification abuses described above, YouTube has issued nine unfounded and procedurally baseless allegations of "fraudulent takedown" against the Plaintiff, identified under IDs:

GZZCVHCPPS2CHWXAUZ4IUK72BY;

RR5FOVIVPGBF4BAR4QUYOHHFME;

NN7YQJ4NQL5KQPBEBJMJKIACV4;

GGVXXUL237NCEYWNVZIQRDUW24;

LSLO5OJ4XFEFUYCDTSLAVMKFN4;

6W3SBRSTTRJJXR5Q5ME2ZRFBCE;

XGTNS7RMT6EN4YQPSJJXAIOTPE;

REH6WERH672ZMU5RFT3T5JBA7Y;

UAUHZ7UNJ7CAWEX7YLS4TREPRY.

101.    YouTube's issuance of repeated "fraud" warnings—despite the Plaintiff's fully compliant DMCA notices and without identifying any misrepresentation or statutory defect—constitutes a systematic abuse of the DMCA process and a materially improper handling of takedown requests. As documented in Exhibit 37-B, YouTube transmitted nine separate fraud-accusation notices, each using identical boilerplate language, referencing YouTube LLC v. Brady without factual justification, and threatening account termination despite the Plaintiff providing complete ISRC, UPC, authorship verification, and statutory declarations under 17 U.S.C. §512(c)(3).

102.    This pattern of false fraud accusations is incompatible with the platform's obligations under §512(i) to maintain a fair and non-abusive copyright-enforcement system, and it demonstrates both bad-faith processing and willful disregard for the statutory duties imposed on service providers. By repeatedly mischaracterizing legitimate DMCA notices as "fraudulent," YouTube acted outside the boundaries of safe-harbor behavior and engaged in conduct directly actionable under §512(f) for knowingly or recklessly misrepresenting the status of the Plaintiff's claims.

**IX.D.  Instance  38-53—SIXTEEN  INDEPENDENT  INSTANCES  OF WILLFUL  BLINDNESS,  BAD-FAITH  EVALUATION,  AND  MECHANICAL REJECTION OF A STATUTORY-COMPLIANT DMCA NOTICE**

**IX.D.1.  Repeated  Improper  Demands  for  Information  Already  Provided (§512(c)(3) Violations)**

103.    In all sixteen instances, including Case ID:

5ZUHL5CUG3KYVSEULSTFYS3R5I;

NN7YQJ4NQL5KQPBEBJMJKIACV4;

GZZCVHCPPS2CHWXAUZ4IUK72BY;

GGVXXUL237NCEYWNVZIQRDUW24;

LSLO5OJ4XFEFUYCDTSLAVMKFN4;

6W3SBRSTTRJJXR5Q5ME2ZRFBCE;

XGTNS7RMT6EN4YQPSJJXAIOTPE;

CUZ43LLPMQNODTGQBF2NWJDKIU;

CD3H7AQWEBXMU5XDE22X5UT3XI;

E3UIUEYQNAG4HMYH6MD2UXPD2I;

REH6WERH672ZMU5RFT3T5JBA7Y;

DMDGXIKEB2GRIEDYZX5ARBCGUM;

Q3BEAFSXB5XUG4RJGUKSH6OF6U;

KT4FQQMK7UQGQ27LR67D6RUETA;

UAUHZ7UNJ7CAWEX7YLS4TREPRY;

KFZW2VNUW7QBUTPXKZ35LLJRII,

YouTube issued formulaic requests for "additional information" despite the Plaintiff having already supplied every statutory element required under 17 U.S.C. §512(c)(3). These demands were not tied to any legal requirement under the DMCA and served only to delay or obstruct the takedown process. Each statutory-compliant notice included full identification of the copyrighted work, ISRC, UPC, timestamps, distribution metadata, sworn declaration, and complete contact details. YouTube's practice of repeatedly requesting information already present in the notice constitutes a uniform pattern of bad-faith procedural obstruction across all sixteen cases (see Exhibit 38–53(A)).

**IX.D.2. False Determinations That the Copyrighted Work "Does Not Appear" in the Infringing Video**

104.    In each of the sixteen instances, YouTube ultimately issued the same predetermined conclusion: that the copyrighted material "does not seem to appear" in the infringing video. This determination was made after the Plaintiff provided timestamps (1–11 seconds vocal; 12–21 seconds instrumental), technical analysis, identification of derivative misuse ("Rat Dance"), BandLab creation metadata, publication data, and a detailed explanation of the melodic elements used in the infringing work. Despite this evidence, YouTube responded with the same boilerplate phrase used in the other instances. This conduct reflects a mechanical rejection process divorced from any factual review, and therefore constitutes willful blindness as defined in federal DMCA jurisprudence.

**IX.D.3. Failure to Conduct Any Comparison or Review of the Audio Material (Red-Flag Knowledge)**

105.    YouTube did not examine the audio content in any of the sixteen disputed

30

videos. No technical comparison was conducted, no Content ID logs were reviewed, and no evaluation of melodic similarity was performed, even though the Plaintiff supplied all necessary identifiers and analysis. Instead, YouTube relied entirely on an automated conclusion template that ignores timestamps, composition metadata, and the recognition-based standards affirmed in Swirsky v. Carey and applied in Newton v. Diamond. This systemic refusal to review evidence—despite explicit notice—constitutes red-flag knowledge and actual knowledge under §512(c)(1)(A)(i)–(ii), causing YouTube to forfeit Safe Harbor protection.

### IX.D.4. Substitution of Non-Statutory "Appeal" Procedures in Place of §512(g)

106.    In all sixteen instances, YouTube informed the Plaintiff that the proper remedy was to "appeal" the rejection through its internal system. This internal "appeal" process has no basis in the DMCA, which provides only one lawful mechanism:

– takedown via §512(c)(3),

– restoration via §512(g)(2) only upon receipt of a counter-notification.

By forcing the Plaintiff into a non-statutory "resolution options" procedure, YouTube imposed an unlawful barrier to enforcement, violating §512 and engaging in bad-faith evasion of statutory duties.

### IX.D.5.    Continued    Hosting    of    Infringing    Videos    Without Counter-Notification (§512(g) Violations)

107.    Across the sixteen instances, YouTube refused to remove infringing videos without receiving any valid counter-notification from the uploaders, as required by §512(g)(2)(B)–(C). YouTube left the infringing content online after mechanically rejecting the valid notice. Such restorations—absent counter-notices—constitute direct statutory violations and place the platform outside the Safe Harbor protections.

### IX.E. BAD-FAITH PROCESSING, FALSE CLAIM OF "INCOMPLETE INFORMATION," AND UNLAWFUL RESTORATION WITHOUT COUNTER-NOTIFICATION

108.    YouTube engaged in the same pattern of improper conduct in four independent copyright complaints, identified as:

ANQRS5X5VY7I6V6PTUNY5MTVM4,

31

ABOP67TLKXF35MPUIJAQYG22SI,
X5XJYEMJQYRLB5TQAIG7O2VGPM,
Y32TSJZPMSYTKPY5GWWZ7AAZYY.

In each of these instances, YouTube initially confirmed receipt of a valid, statutory-compliant DMCA notice, then imposed a non-statutory "review period," followed by a boilerplate statement claiming that the Plaintiff had provided "incomplete information." Despite the absence of any counter-notification from the uploaders—as required by 17 U.S.C. §512(g)(2)(B)–(C)—YouTube proceeded to restore or refuse to remove the infringing content. This sequence of actions constitutes bad-faith processing, willful blindness, and a direct violation of §512(g)'s mandatory restoration procedure, which authorizes reinstatement only upon receipt of a sworn counter-notification.

109.    Across these four cases, YouTube executed the same unjustified chain of procedural errors: (1) acknowledgment of a valid takedown request; (2) delaying removal by invoking internal, non-statutory "review mechanics"; (3) failing to disable access expeditiously as required by §512(c)(1)(A)(iii); (4) restoring or maintaining the content despite the complete absence of a counter-notice; and (5) issuing false or contradictory explanations to justify its refusal to comply with statutory requirements. This recurring pattern demonstrates deliberate avoidance of DMCA obligations and mechanical rejection of lawful notices rather than any genuine evaluation of the facts or evidence presented.

110.    Full internal correspondence and procedural logs confirming this pattern can be provided upon request or order of the Court. They are not attached at this stage because the Plaintiff limits the filing to complaint IDs only, as the procedural violations speak for themselves and the Plaintiff seeks to avoid unnecessary volume until the Court deems such material necessary.

**IX.F.    FAILURE TO RECOGNIZE FORCE-MAJEURE POSTAL SUSPENSION, AND UNLAWFUL REINSTATEMENT DESPITE VALID LEGAL ACTION**

111.    In the counter-notification proceedings associated with DMCA Complaint XG43QW5BYPEN4HEK4DPQRKBBXI and Counter-Notification T6GZHZSWQBOUV5LJACUDRDZAIQ, the Plaintiff explained that he is a legal

resident of Norway and that, due to temporary postal restrictions, physical mail delivery from Norway to the United States was suspended until January 1, 2026, making immediate physical submission to the Clerk's Office temporarily impossible. The Plaintiff clearly stated that the physical submission would be dispatched as soon as international mail service resumed, and that the temporary inability to transmit paper copies did not affect the validity of the digital filing.

112.    Despite being fully informed of these objective circumstances, YouTube refused to recognize the digital Complaint as evidence of legal action under §512(g)(2)(C), and failed to account for the documented force-majeure conditions affecting international mail. Instead of maintaining the video in the disabled state until the litigation could proceed—a requirement of §512(g) when legal action is confirmed—YouTube mechanically reinstated the infringing video after ten business days, as if the Plaintiff had submitted no lawsuit at all. This reinstatement occurred in direct violation of §512(g)(2)(C), which mandates that once evidence of legal action is provided, YouTube must keep the content offline until the federal court resolves the dispute.

113.    By ignoring the legal sufficiency of the digital filing, rejecting the Plaintiff's explanation of force-majeure postal suspension, and restoring the infringing video during an active federal dispute, YouTube demonstrated bad-faith evaluation, willful blindness, and a disregard for both statutory obligations and the practical realities preventing immediate physical service. The procedural record for this instance can be provided upon request or order of the Court; only complaint identifiers are listed here for efficiency.

114.    The Plaintiff respectfully requests that the Court order verification of the identity, address, and legal capacity of the John Doe 4 counter-notifier pursuant to 17 U.S.C. §512(g)(3), due to substantial indicators that the counter-notification may contain inaccurate, incomplete, or falsified information. Such verification is necessary to ensure proper service of process, confirm statutory compliance, and determine whether the counter-notification is valid under federal law or constitutes a defective or fraudulent filing.

### IX.G.  CONTRADICTORY DETERMINATIONS

115.    In all four instances, YouTube initially accepted the Plaintiff's DMCA notices under IDs:

VHJKTRFIJGKFHUBZR5FHFNBZCE,

HE2CN3YNSTEWKFPD7ZPHT4XEIU,

6KXEHVIQIYMYJ47FU4KKKEW63A,

U5OJQ3CJYKEOIG4WJNECQJZECI,

thereby confirming statutory compliance under 17 U.S.C. §512(c)(3). Then YouTube imposed a "seven-day waiting period," a procedure not authorized anywhere in §512 and incompatible with the platform's duty to disable access expeditiously under §512(c)(1)(A)(iii).

116.    More recently, YouTube received a counter-notifications under IDs:

RUIT5BWZMKRZ5MZU4UXGIPRNZY,

ZENFP7OSYHZYQKKCD6U4J7YBQQ,

LZRWXAGY46SYGVJSRU5REU2JLY,

R5EW3CARWLSYL234TESSHFTDRE,

containing multiple materially false statements. Instead of evaluating the counter-notifications or following the statutory sequence of §512(g)(2)(B)–(C), YouTube restored the infringing URL outside of the counter-notification process.

117.    This sequence—unlawful restoration without counter-notice, contradictory justifications, mechanical rejection of a valid claim, and acceptance of a counter-notification containing demonstrably false factual assertions—constitutes bad-faith processing, willful blindness, and direct statutory violations of §512(c)(1)(A)(iii) and §512(g)(2)(B)–(C). Supporting correspondence can be provided upon request of the Court; only complaint IDs are listed here for procedural economy.

118.    The Plaintiff respectfully requests that the Court order verification of the identity, address, and legal capacity of the John Does 5, 6, 7, 8 counter-notifier pursuant to 17 U.S.C. §512(g)(3), due to substantial indicators that the counter-notification may contain inaccurate, incomplete, or falsified information. Such verification is necessary to ensure proper service of process, confirm statutory compliance, and determine whether the counter-notification is valid under federal law or constitutes a defective or fraudulent filing.

## IX.H.  IMPROPER DEFLECTION TO THIRD-PARTY DISTRIBUTOR AND REFUSAL TO ACT ON A STATUTORY-COMPLIANT NOTICE

119.     The Plaintiff submitted a fully statutory-compliant DMCA notice under ID NPNWXP6GB7VTQ3VSDBYXNQA7MM on October 30, 2025, identifying the copyrighted sound recording "I Scream" and the infringing YouTube auto-generated track at https://www.youtube.com/watch?v=E-dbnFpNnyI. YouTube acknowledged receipt of the notice, thereby confirming compliance with 17 U.S.C. §512(c)(3), but refused to remove or disable access to the content on the sole ground that the track had been delivered by a YouTube "partner" and that a licensor name appeared in the "Provided to YouTube by [licensor]" line. Instead of honoring its statutory obligations, YouTube instructed the Plaintiff to resolve the matter directly with the third-party distributor (TuneCore or another licensor) and conditioned any further review on the outcome of that separate off-platform dispute.

120.     The Plaintiff promptly informed YouTube that he had initiated an internal copyright investigation with the distributor, yet YouTube took no further action, left the infringing track online, and responded only with a generic request for "additional information" without specifying what was missing. By deflecting the complaint to a third-party distributor and refusing to act on a valid takedown notice solely because the content was supplied by a commercial partner, YouTube violated its duty to expeditiously remove or disable access under §512(c)(1)(A)(iii) and improperly subordinated DMCA compliance to its private licensing arrangements. This behavior constitutes bad-faith processing, willful blindness, and a systemic attempt to shield partner-delivered content from lawful DMCA enforcement. Supporting correspondence may be provided upon request of the Court; only the complaint ID and URL are listed here for brevity.

121.     Plaintiff respectfully requests that the Court order identification of the individual who submitted a counter-notification in response to Plaintiff's copyright claim in the TuneCore/YouTube distribution system. Although the present dispute was triggered by the availability of the infringing track on YouTube, the counter-notification itself was submitted through TuneCore's rights-management interface, outside the formal DMCA process of YouTube. The counter-notifier asserted authorship over the same melody under an alternative title ("Rat Dance"), creating a direct authorship conflict between the

parties.

122.    Because the counter-notifier has provided only unverified information and is presently identifiable only by a display name and email within the TuneCore correspondence, Plaintiff cannot initiate a proper copyright infringement action or resolve the authorship dispute without judicial assistance. Therefore, Plaintiff requests that the Court compel disclosure of the counter-notifier's verified identity of John Doe 9 and contact information necessary for service of process and adjudication of the authorship conflict.

## IX.I. IMPROPER DEFLECTION TO DITTO MUSIC AND FALSE FRAUD ALLEGATIONS

123.    Plaintiff submitted a fully statutory-compliant DMCA notice under ID RR5FOVIVPGBF4BAR4QUYOHHFME on October 31, 2025, identifying the copyrighted sound recording "I Scream" (ISRC TCAJE2557107, UPC 196056327182) and the infringing auto-generated YouTube track "Rat Dance · Sonic Piñotas Music" (Provided          to          YouTube          by          Ditto          Music)          at https://www.youtube.com/watch?v=ucBj9VbSwyk. YouTube acknowledged the notice but refused to remove the track, deflecting responsibility to its commercial partner Ditto Music on the ground that the content was delivered as a "partner track with cover art." Plaintiff then contacted Ditto Music, which expressly refused to process his copyright complaint, closed his internal fraud/licensing ticket, and directed him back to individual DSPs, including YouTube. Ditto confirmed no licensing relationship with Plaintiff or his label and provided no evidence of authorization for "Rat Dance."

124.    Upon receiving this confirmation, Plaintiff supplied YouTube with a detailed written explanation of his exclusive rights and requested removal of the infringing track. Instead of honoring the DMCA notice, YouTube twice accused Plaintiff of a "possible fraudulent attempt" and threatened termination of his channel, while demanding unspecified "additional information," despite already having complete work identification, distribution metadata, and a forensic Technical Report demonstrating substantial melodic similarity between "I Scream" and the disputed audio. YouTube nevertheless left the partner-delivered "Rat Dance" track online and refused to disable access.    Plaintiff    therefore    alleges    that    YouTube's    handling    of    this

complaint—commercial deflection to Ditto, baseless fraud accusations, and refusal to act on a valid DMCA notice—constitutes bad-faith processing, willful blindness, and a departure from the conditions of §512(c).

125.    Because the track "Rat Dance · Sonic Piñotas Music" was delivered through YouTube's partner pipeline and Ditto Music has declined to provide any identifying information or accept a DMCA complaint, Plaintiff further requests that the Court compel YouTube (and, if necessary, its partner Ditto Music) to disclose the verified identity and contact information of the individual responsible for releasing this recording (designated herein as John Doe 10), so that John Doe 10 may be named as a defendant in Plaintiff's copyright infringement and authorship action concerning the misappropriated melody marketed under the "Rat Dance" title.

## X. CAUSE OF ACTION I

DIRECT COPYRIGHT INFRINGEMENT

(17 U.S.C. §§ 101–106, 501)

126.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

127.    Plaintiff is the sole and exclusive copyright owner of the musical composition and sound recording titled "I Scream," fixed on November 26, 2024, and automatically protected under 17 U.S.C. §102(a) and §104(b)(3). As documented in the forensic report, distribution records, and integrity evidence, the work contains an original melodic structure defined in Paragraphs 31–34 of this Complaint (the "Protectable Motif").

128.    Defendants—including YouTube LLC, Google LLC, and Alphabet Inc. (collectively, "Defendants")—directly infringed Plaintiff's exclusive rights under 17 U.S.C. §106 by reproducing, distributing, publicly performing, and facilitating widespread dissemination of unauthorized derivative works incorporating the Protectable Motif. These works include, but are not limited to, the recordings identified in Exhibits 01-A through 34-A and the unresolved infringing Instances documented in General Exhibit R-3.

129.    The infringing recordings incorporate substantial protectable musical expression recognizable to an ordinary listener even after transposition,

37

re-instrumentation, time-stretching, pitch-shifting, looping, or audio filtering. Technical melodic-similarity analysis demonstrates high congruence between the infringing audio and Plaintiff's original composition, confirming copying rather than independent creation.

130. Defendants exercised volitional conduct by hosting, streaming, recommending, fingerprinting, and monetizing infringing videos, Shorts, and partner-delivered tracks. Defendants' automated systems further assigned Content ID ownership in a manner that elevated later-created derivative works (such as "chess (slowed)") above earlier-fixed original, causing systemic misattribution of authorship and allowing derivative works to replace and displace legitimate distribution.

131. Across sixty-four (64) DMCA notices, Defendants repeatedly acquired actual and red-flag knowledge of infringement. Defendants removed thirty-four (34) infringing videos (including twenty-seven voluntarily removed and seven forcibly removed), thereby acknowledging infringement, but later restored some of these videos without receiving valid counter-notifications. Defendants also refused to remove at least thirty (30) additional infringing recordings despite receiving complete, compliant, and verified notices.

132. Defendants issued baseless accusations of "fraud" against Plaintiff, applied non-statutory procedures to undermine valid notices, accepted defective counter-notifications containing false statements, and restored infringing content in direct contradiction of Plaintiff's rights. Defendants' conduct shows not only direct infringement but willful disregard for Plaintiff's copyright.

133. Plaintiff never granted any license, authorization, assignment, or permission allowing Defendants or any uploader to reproduce, distribute, synchronize, monetize, claim ownership over, or derive works from the Protectable Motif.

134. Defendants' acts constitute willful direct infringement under 17 U.S.C. §501. Plaintiff is entitled to actual damages, statutory damages (including enhanced damages for willful infringement under §504(c)(2)), disgorgement of profits, injunctive relief, costs, and all remedies available under 17 U.S.C. §§502–505.

## XI. CAUSE OF ACTION II
### CONTRIBUTORY COPYRIGHT INFRINGEMENT

38

135.   Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

136.   Defendants had actual and repeated knowledge of ongoing infringement of Plaintiff's work. This knowledge arose from Plaintiff's sixty-four (64) DMCA notices; Defendants' own thirty-four (34) takedowns confirming infringement; detailed forensic similarity evidence; repeated internal "review" exchanges; and the ongoing availability of infringing recordings in Instances 35–64 despite continued notice.

137.   Despite acquiring detailed knowledge of infringement, Defendants materially contributed to infringing activity by:

> A.  hosting, streaming, and recommending infringing recordings after receiving valid takedown notices;
>
> B.  restoring previously removed infringing content without receiving any valid counter-notification;
>
> C.  accepting and processing counter-notifications lacking the elements required by §512(g)(3) or containing false statements;
>
> D.  refusing to remove infringing material in numerous Instances even though Plaintiff provided complete statutory-compliant identification;
>
> E.  enabling and promoting infringing partner-delivered tracks, including those mislabeled or auto-placed under Topics and auto-mixes;
>
> F.  algorithmically amplifying infringing recordings through Shorts feeds, autoplay systems, and recommendation algorithms;
>
> G.  allowing repeat infringers to continue uploading materially identical infringing tracks without suspension, enforcement, or policy action.

138.   Defendants' infrastructure—including hosting servers, Content ID fingerprinting, monetization systems, recommendation engines, automatic track-generation mechanisms, and partner-ingestion channels — supplied the primary tools through which infringement occurred. By continuing to provide these systems despite clear notice of infringement, Defendants induced, encouraged, and materially facilitated unlawful copying.

139.   Defendants also preserved infringing material and revenue streams because such content generated advertising impressions, user engagement, watch-time,

and economic benefits. This conduct enabled and expanded the scale of infringement and constitutes contributory liability under established federal law, including the principles set forth in Napster, Grokster, and Perfect 10.

140.    As a direct and foreseeable result of Defendants' contributory infringement, Plaintiff suffered suppression of lawful distribution, diversion of revenue, displacement of his legitimate work by derivatives, devaluation of authorship, and confusion among listeners and digital-distribution platforms.

141.    Plaintiff is entitled to actual damages, statutory damages, disgorgement of profits, injunctive relief, and all remedies available under 17 U.S.C. §§502–505.

## XII. CAUSE OF ACTION III

VICARIOUS COPYRIGHT INFRINGEMENT

142.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

143.    At all relevant times, Defendants YouTube, LLC, Google LLC, and Alphabet Inc. (collectively, "Defendants") had both (a) the legal right and practical ability to supervise, control, disable, and remove infringing uses of Plaintiff's work on the YouTube platform, and (b) a direct financial interest in the continued availability and dissemination of such infringing content.

144.    As detailed in Sections VII–IX, Defendants control every material aspect of the platform's operation, including: hosting of videos and Shorts; activation and deactivation of Content ID claims; enforcement and non-enforcement of DMCA takedowns; the structure and operation of internal "appeal" and "review" procedures; the configuration of recommendation algorithms that promote or suppress particular videos; and the monetization framework through which advertising revenue is generated and shared. Defendants may at any time remove videos, suspend channels, disable monetization, terminate Content ID claims, or block repeat infringers, and they routinely exercise these powers in other contexts.

145.    Defendants also derive a direct financial benefit from the infringement of Plaintiff's work. The infringing recordings identified in Exhibits 01-A through 34-A and in General Exhibit R-3 amassed millions of views across standard videos, Shorts, and partner-delivered tracks, generating advertising impressions, increased watch-time, and

audience engagement that translate into higher revenues and platform value for Defendants. Partner-delivered tracks such as "chess (slowed)" and "Rat Dance" were monetized through Content ID and YouTube's partner programs, yielding advertising and subscription income in which Defendants share. The infringing content was not merely incidental; it attracted significant traffic and contributed materially to Defendants' commercial success.

146.    Despite having both knowledge of infringement—through Plaintiff's sixty-four (64) DMCA notices, Defendants' own thirty-four (34) prior takedowns, and the detailed technical evidence of copying—and the practical ability to prevent or stop such infringement, Defendants failed to remove, and in many cases affirmatively restored, infringing recordings. As described in Sections VIII and IX, Defendants: (a) allowed infringing videos to remain available after receiving valid notices; (b) restored previously removed videos without valid counter-notifications; (c) continued to host and promote infringing partner-delivered tracks; and (d) refused to terminate or discipline repeat infringers despite clear evidence of ongoing misuse of Plaintiff's work.

147.    By maintaining infringing recordings online, continuing to monetize them, and permitting their recommendation and auto-generation across multiple platform features (including Topics, auto-mixes, and Shorts feeds), Defendants received a direct financial benefit that was causally linked to the infringement, while simultaneously retaining the right and ability to stop or limit that infringement at any time. This conduct satisfies the elements of vicarious liability under 17 U.S.C. §501 and applicable federal jurisprudence.

148.    As a direct and proximate result of Defendants' vicarious infringement, Plaintiff has suffered economic loss, suppression of legitimate distribution, devaluation of authorship, and confusion regarding the origin of the Protectable Motif. Plaintiff is entitled to actual damages, disgorgement of Defendants' and infringers' profits, statutory damages, and injunctive relief under 17 U.S.C. §§502–505.

## XIII. CAUSE OF ACTION IV

VIOLATION OF DMCA §512(c)

(Failure to Qualify for and Maintain Safe-Harbor Protection)

149.    Plaintiff realleges and incorporates by reference all preceding paragraphs

as though fully set forth herein.

150.   Under 17 U.S.C. §512(c), online service providers may obtain conditional safe-harbor protection only if they satisfy specific statutory requirements, including: absence of actual or red-flag knowledge of infringement; expeditious removal or disabling of access upon obtaining such knowledge; no direct financial benefit in circumstances where the provider has the right and ability to control infringing activity; proper receipt and handling of compliant DMCA notices under §512(c)(3); adherence to the counter-notification and restoration procedures of §512(g); and adoption and reasonable implementation of a repeat-infringer policy under §512(i).

168. As detailed in Sections IV, VII, VIII, and IX, Defendants failed to satisfy these conditions and therefore forfeited any safe-harbor protection under §512(c). Specifically, Defendants:

(a) obtained actual and red-flag knowledge of infringement through Plaintiff's sixty-four (64) DMCA notices, repeated submissions of technical forensic evidence, and their own thirty-four (34) prior takedowns acknowledging infringement, yet continued to host, recommend, and monetize materially identical infringing content;

(b) failed to act expeditiously to remove or disable access to infringing material in at least thirty (30) unresolved Instances, repeatedly issuing boilerplate assertions that the copyrighted content "does not appear" without conducting any meaningful audio comparison or review of Content ID logs;

(c) refused to remove infringing material where no counter-notification had been filed, and in some cases restored or maintained access to infringing videos after initially accepting Plaintiff's notices as compliant under §512(c)(3), as documented in Section IX and General Exhibit R-3;

(d) accepted and processed counter-notifications that lacked the statutory elements required by §512(g)(3), contained facially false statements made under penalty of perjury, or were submitted through non-DMCA channels, then relied on those defective counter-notifications to deny, reverse, or undermine Plaintiff's valid takedown requests;

(e) substituted non-statutory "review," "appeal," and "resolution options" procedures in place of the exclusive takedown and restoration framework mandated by §512(c) and §512(g), thereby imposing unlawful barriers on Plaintiff's enforcement

rights and evading DMCA obligations;

(f) failed to reasonably implement a repeat-infringer policy as required by §512(i), as evidenced by the continued availability of infringing recordings from the same uploaders and partners despite multiple notices, internal acknowledgements of infringement, and repeated procedural abuses; and

(g) failed to preserve and produce server-side monetization and analytics data after acquiring knowledge of infringement, resulting in the destruction and loss of electronically stored information (ESI) necessary to calculate actual damages and infringers' profits, contrary to Defendants' obligations under §504(b) and the preservation standards reflected in FRCP 37(e).

151.    Defendants' refusal to remove infringing content after acquiring actual knowledge, their restoration and continued hosting of infringing recordings without adherence to §512(g), and their use of non-statutory internal procedures in place of DMCA mechanisms collectively place Defendants outside the scope of §512(c) safe harbor. Having forfeited that protection, Defendants are fully liable for the underlying copyright infringements alleged in this Complaint.

152.    As a direct and foreseeable result of Defendants' noncompliance with §512(c) and related provisions, Plaintiff suffered suppressed distribution, displacement of his own recordings by infringing derivatives, loss of licensing and synchronization opportunities, reputational harm, and deprivation of access to critical monetization and viewership data. Plaintiff is entitled to actual and statutory damages, disgorgement of profits, injunctive relief, and such additional relief as the Court deems just and proper.

## XIV. CAUSE OF ACTION V

VIOLATION OF DMCA §512(g)

(Unlawful Restoration and Retention of Infringing Content)

153.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

154.    Section 512(g) of the DMCA establishes a narrow and exclusive procedure for restoring material that has been removed or disabled in response to a valid takedown notice. Under §512(g)(2)(B)–(C), a service provider may restore content only (a) upon receipt of a counter-notification that fully complies with §512(g)(3), and (b)

after waiting 10–14 business days while the notifier decides whether to file an action seeking a court order to restrain the infringing activity. If evidence of legal action is provided, the provider must keep the content offline until the dispute is resolved.

155.    Defendants repeatedly failed to comply with these requirements and instead restored, retained, or refused to disable infringing content in direct violation of §512(g). As detailed in Sections VIII.C, IX.B, IX.E, IX.F, and IX.G:

(a) Defendants restored videos that had previously been removed or disabled following Plaintiff's valid DMCA notices, including Instances documented in Exhibits 33-A and 34-A, despite the absence of any valid counter-notification and despite Plaintiff's continued assertion of his rights;

(b) Defendants accepted and relied on counter-notifications that were facially defective, contained materially false statements made under penalty of perjury, or failed to include the elements required by §512(g)(3), then used those defective counter-notifications as a basis for reinstating infringing material and demanding evidence of federal litigation from Plaintiff;

(c) in at least four instances identified in Section IX.E, Defendants first acknowledged Plaintiff's notices as valid, imposed non-statutory "review" delays, later asserted that Plaintiff's information was "incomplete," and restored or refused to remove content even though no counter-notification had been filed, thereby bypassing the statutory sequence in §512(g)(2)(B)–(C);

(d) in the proceedings described in Section IX.F, Defendants were informed that Plaintiff, as a resident of Norway, was temporarily unable to use postal services to the United States due to a documented suspension between August 29, 2025 and January 1, 2026 (General Exhibit G-4), and that Plaintiff had filed or intended to file a federal Complaint electronically. Nevertheless, Defendants treated the temporary inability to mail physical documents as if no legal action had been taken and restored the infringing video after the 10-business-day period, contrary to §512(g)(2)(C), which requires continued disablement once legal action is commenced;

(e) Defendants used internal "appeal" and "resolution" mechanisms, which have no basis in §512(g), to override Plaintiff's takedowns and re-enable infringing content, rather than limiting themselves to the narrow restoration pathway set forth in the statute.

156.    By restoring infringing material without valid counter-notifications, by relying on defective or fraudulent counter-notifications, by disregarding force-majeure conditions affecting Plaintiff's ability to mail physical pleadings while treating digital filings as legally irrelevant, and by substituting informal internal procedures for the statutory §512(g) framework, Defendants violated the DMCA's restoration provisions and lost any protection that might otherwise have been available under §512.

157.    As a direct and proximate result of Defendants' violations of §512(g), infringing recordings remained publicly accessible for extended periods, accrued additional views and monetization, displaced Plaintiff's legitimate distribution channels, reinforced misattribution of authorship, and undermined Plaintiff's ability to enforce his rights both on YouTube and across other digital service providers. Plaintiff is entitled to statutory and actual damages, injunctive and declaratory relief, and all further relief the Court deems just and proper.

## XV. DECLARATORY JUDGMENT

(28 U.S.C. §§ 2201–2202)

158.    Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

159.    An actual, substantial, and continuing controversy exists between Plaintiff and Defendants — including YouTube LLC, Google LLC, and Alphabet Inc. — concerning Plaintiff's exclusive rights in the musical composition and sound recording titled "I Scream," and Defendants' ongoing refusal to acknowledge those rights in the administration of takedown procedures, Content ID attribution, partner-delivered recordings, and counter-notification processing.

160.    Plaintiff's work was fixed on November 26, 2024, and automatically obtained copyright protection under 17 U.S.C. §102(a) and §104(b)(3). Plaintiff's authorship, fixation, distribution, and ownership have been conclusively verified through forensic integrity records, TuneCore distribution metadata, ISRC/UPC credentials, and further documentation provided in Exhibits G-1 through G-4, D, and M-1. Despite receiving sixty-four (64) DMCA notices supported by such evidence, Defendants have repeatedly refused to recognize Plaintiff's rights and have consistently misclassified derivative recordings as "original," including derivative "type beat" manipulations

contained in the "chess" family of uploads.

161.    Defendants' actions — including (1) the acceptance of facially defective counter-notifications, (2) restoration of infringing material without counter-notifications, (3) improper reliance on later-created Content ID fingerprints over earlier fixation, and (4) substitution of non-statutory "appeal" mechanisms — have created a continuing legal uncertainty regarding Plaintiff's rights and the enforceability of the Copyright Act.

162.    This uncertainty directly impairs Plaintiff's ability to protect his work, to enforce takedown rights, to safeguard access to distribution channels, and to prevent the recurrence of infringements across Defendants' platform and partner-networks.

163.    Accordingly, an actual controversy exists for which the Court may issue declaratory relief under 28 U.S.C. §2201.

164.    Plaintiff therefore seeks a judicial declaration that:

1.    Plaintiff is the sole and exclusive copyright owner of the musical composition and sound recording "I Scream";

2.    Plaintiff's work was validly fixed on November 26, 2024, and is fully protected under 17 U.S.C. §§102(a), 104(b)(3);

3.    The melodic expression defined in Paragraphs 31–34 constitutes protectable authorship;

4.    YouTube videos, YouTube Shorts, and tracks with artworks identified in Exhibits 01–A through 34–A and all thirty unresolved Instances identified in Exhibit R-3 are infringing derivative works;

5.    Defendants' practices of reinstatement without counter-notification, reliance on Content ID misclassification, and mechanical rejection of statutory-compliant notices violate the DMCA;

6.    No uploader, distributor, platform partner, or purported licensee — including, without limitation, the individuals and entities who uploaded or distributed YouTube videos, YouTube Shorts, auto-generated tracks, or tracks with artworks identified in Exhibits 01–A through 34–A and all thirty unresolved Instances in Exhibit R-3, or who have uploaded or distributed any other work under the titles or labels 'chess beat,' 'chess (speed-up),' 'chess (slowed),' 'chess (type beat),' 'chess (super slowed),'

'Rat Dance,' 'Rat Song,' 'Dancing Rat,' 'Dance Rat,' or any derivative, stylized, expanded, concatenated, re-titled, pitch-shifted, slowed, accelerated, re-instrumented, re-performed, or otherwise modified version containing these or similar designations — holds, held, or could hold any valid rights, authorization, or license that supersedes, conflicts with, or displaces Plaintiff's earlier fixation and exclusive copyright in 'I Scream.' This declaration applies to all past, present, and future uses incorporating the Protectable Motif, regardless of format, metadata, title variation, distribution method, or manner of algorithmic ingestion.

Such a declaration is necessary to resolve the parties' adverse legal positions and to prevent continued interference with Plaintiff's statutory rights.

## XVI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and grant the following relief:

## XVI.A. DECLARATORY RELIEF

165.    A declaration consistent with Section XV above, confirming Plaintiff's sole ownership and the infringing and derivative nature of the recordings identified in Exhibits 01–A through 34–A and Exhibit R–3.

## XVI.B. INJUNCTIVE RELIEF

166.    A permanent injunction ordering Defendants:

(a) to remove or disable access to all infringing videos, Shorts, auto-generated tracks, and partner-submitted recordings containing the Protectable Motif;

(b) to cease restoring any infringing content absent a valid counter-notification that fully complies with 17 U.S.C. §512(g)(3);

(c) to preserve and produce all monetization data, impression logs, revenue histories, watch-time analytics, and ESI associated with the infringing recordings;

(d) to disclose the identities and verified contact information of the John Doe uploaders and counter-notifiers to allow proper service in this action.

## XVI.C. DAMAGES

167.    An award of:

a. Statutory damages under §504(c) for every past, present, and future instance of

47

infringement, including enhanced damages under §504(c)(2) for willful conduct.

b. actual damages in the form of:

> – lost licensing and distribution revenue;
>
> – infringer's profits under §504(b);
>
> – all revenue attributable to engagement generated by infringing uploads on Defendants' platform;
>
> – damages arising from obstructed distribution and suppressed visibility of Plaintiff's legitimate release.

c. compensatory damages for reputational harm and takedown abuse, as the Plaintiff's work—rooted in Norwegian cultural themes—has no association whatsoever with "rat dances," "rat songs," has not based on "type beats," or any similar mischaracterizations, with damages to be proven at trial.

## XVI.D. ACCOUNTING AND PRODUCTION OF RECORDS

168.    An order compelling Defendants to produce all records necessary to calculate damages, including but not limited to:

(a) complete view-count histories for all infringing videos;

(b) monetization records, including revenue earned and withheld;

(c) all Content ID ownership logs, claims, fingerprints, and match histories;

(d) all DMCA processing logs relating to Plaintiff's sixty-four (64) notices;

(e) all internal decision records referencing Plaintiff's claims;

(f) all metadata and logs sufficient to identify John Does 1–26.

## XVI.E. COSTS AND OTHER RELIEF

169.    (Although Plaintiff proceeds pro se) an award of taxable costs, filing fees, expert-report costs, and all recoverable litigation expenses pursuant to 17 U.S.C. §505.

## XVI.F. ACCOUNTING AND PRODUCTION OF RECORDS

170.    An order compelling Defendants to produce:

a. Content ID fingerprint logs associated with the infringing uploads;

b. DMCA processing logs tied to all sixty-four notices;

c. partner-delivery and ingestion records related to the recordings marketed as "chess (type beat)," "chess (slowed)," "Rat Dance," or similar titles.

## XVI.F. ANY ADDITIONAL RELIEF

171.    Any further relief the Court deems just, equitable, and proper given the scope, scale, and systemic nature of the infringements and statutory violations.

### XVII. REQUEST FOR BENCH TRIAL

172.    Plaintiff respectfully requests that this matter be tried to the Court as a bench trial and hereby waives the right to a jury trial, as Plaintiff currently resides outside the United States and is unable to travel to the United States for jury proceedings due to financial, logistical, and processing constraints.

173.    Plaintiff further requests that all hearings, conferences, and proceedings be conducted in written or remote format pursuant to Federal Rule of Civil Procedure 43(a), because Plaintiff resides outside the United States and cannot reasonably appear in person, and several relevant parties are located internationally.

174.    Plaintiff does not oppose in-person appearances by Defendants or their counsel, but requests permission to appear by secure video, or written submission for all proceedings taking into account the difference in time zones.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the facts stated in this Complaint are true and correct to the best of my knowledge and belief.

**SIGNATURE**

**Viacheslav Shlapatskyi**
Plaintiff, Pro Se
Hommevegen 96
Valle, Agder 4747
Norway

Dated: 27.11.2025